IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Norfolk Division - Criminal

**UNITED STATES OF AMERICA,**

    Plaintiff,

v.                    CRIMINAL CASE NO. 2:21-CR-45-01-JAG-RJK

**JESSICA ANN BRONSON**
**also known as Jessica Ann Holcombe,**
**TORY EUGENE DRAIN, SHELBY**
**LYNNETTE PROCTOR, SUSANNE**
**LEE STOUT also known as Susanne Lee Fields**
**and KRISTIN LANE FOSTER,**

    **Defendants.**

## DEFENDANT JESSICA BRONSON'S SENTENCING MEMORANDUM

Defendant Jessica Ann Bronson, through undersigned counsel hereby files the instant Sentencing Memorandum in the above-captioned matter. In so doing, Defendant states that she does *not* have any objections to the presentence investigation report (PSR). For all of the reasons set forth herein, the defense respectfully submits that a sentence of 120 months imprisonment, followed by a term of supervised release is sufficient but not greater than necessary.

**I.**      **INTRODUCTION**

This case represents an all-too-familiar unfortunate example of how a woman aligns herself with "bad boys" early in life and enters into a lifestyle that will haunt her for decades to come. It commonly begins, as it did for Ms. Bronson, with a child growing up in a "lower-middle class [neighborhood] with frequent criminal activity, including drug markets and violence." (PSR at ¶ 110). Feeling abandoned by a parent who left the home suddenly and without explanation (*Id.* at

1

¶ 111), it is not surprising that Ms. Bronson would crave affection and attention and marry a highly-abusive individual at a young age. (*Id.* at ¶ 112).

Continued abuse manifested into heavy drug use – likely to numb the physical and emotional pain. It was predictable that Defendant gravitated towards another individual who was abusive in nature[1] as she cohabitated with a well-known biker who had a lengthy criminal history. (*Id.* at ¶ 113). Amid this lifestyle, Ms. Bronson engaged in a substantial amount of traffic-related and low-level drug offense-conduct which unfortunately, but not excusably, is typical.

Yet even when an individual tries to free themselves from their past, even geographically, it can be difficult to not be haunted by skeletons in the closet and ghosts from the past. Thus, even when the Defendant moved to Arizona in 2020 (*Id.* at ¶ 116), her past acquaintances and their common addictions followed her. Friends asked for "favors" and Ms. Bronson foolishly acquiesced. Still plagued by addiction and the unresolved issues of her childhood and her physical and emotional victimization from past relationships, Defendant made a choice to mail drugs to "friends" in this District. And because of Arizona's proximity to the Mexican border, it stood to reason that the drugs which she mailed were of a higher purity and, thus, more desirable than the diluted compounds which are consumed on the east coast.

## II.   OFFENSE CONDUCT

Defendant concurs with the offense conduct as set forth in ¶¶ 21-47 of the PSR.

## III.   OFFENSE LEVEL AND CRIMINAL HISTORY

### A.   Offense level

---

[1] See generally, *Understanding the Impact of Prior Abuse and Prior Victimization on the Decision to Forego Criminal Justice Assistance in Domestic Violence Incidents: A Life-Course Perspective* http://triggered.stanford.clockss.org/ServeContent?rft_id=info:doi/10.1093/brief-treatment/mhl020 (last visited March 9, 2022)

2

Defendant concurs that her total offense level is 29, as is set forth in ¶ 63 of the PSR.

With this having been said, Defendant seeks a downward variance of two levels given the fact that even the Department of Justice acknowledges that methamphetamine in Arizona is typically of a high potency given the state's proximity to the Mexican border.[2]  "Most of the methamphetamine available in the United States is clandestinely produced in Mexico and smuggled across the [southwest border]."[3]  Indeed, "[i]n the first half of 2019, methamphetamine sampled through the [Drug Enforcement Administration's Methamphetamine Profiling Program] averaged 97.2 percent purity and 97.5 percent potency."[4]

This is not to diminish the dangers of methamphetamine, its profound effects on society, or the Guidelines' well-reasoned enhanced sentencing provisions for ice; however, it illustrates that ice has become the norm, rather than the exception, as to the expected purity of methamphetamine in the United States.

Analogously, in 1986 Congress implemented the Anti-Drug Abuse Act of 1986 reflecting Congress's view that crack cocaine was a more dangerous and harmful drug than powder cocaine, and thereby legislating a five (5) year mandatory minimum sentence for a defendant convicted of possessing five (5) grams or more of crack cocaine.  In order to receive the same mandatory minimum sentence in relation to powder cocaine, that same defendant would have to possess five hundred (500) grams of powder cocaine.

In 2002, the United States Sentencing Commission found that the aforementioned 100:1 weight ratio was created based upon a misperception of the dangers of crack cocaine. The Fair

---

[2] https://www.justice.gov/archive/ndic/pubs6/6384/meth.htm (last visited March 9, 2022)
[3] https://www.dea.gov/sites/default/files/2021-02/DIR-008-21%202020%20National%20Drug%20Threat%20Assessment_WEB.pdf at p. 19 (last visited March 9, 2022)
[4] *Id.* at pp. 19-20.

Sentencing Act of 2010 reduced the disparity between the amount of crack cocaine and powder cocaine, eliminated the mandatory minimum five-year sentence for possession of crack cocaine, and reduced the previous 100:1 weight ratio to an 18:1 weight ratio. This occurred after the Supreme Court of the United States, in *Kimbrough v. United States,* 552 U.S. 85 (2007), vacated the Fourth Circuit's decision that the district court erroneously sentenced appellant outside of the Guidelines, under 18 U.S.C. §3553(a), based upon the sentencing disparities between crack and powder cocaine.

Defendant asks this Court to recognize that the same disparate treatment between ice and methamphetamine exists, as applied to the facts of this case, and to vary downward. Had all of the methamphetamine that is attributable to Defendant been treated as (regular) methamphetamine, as opposed to ice, her total offense level would be 25, rather than 29.

Recognizing the scourge that methamphetamine (as a whole) has created, Defendant seeks a two-level downward variance (rather than a four-level variance) to account for 1) the prevailing trend of high purity methamphetamine in this country that was not accounted for at the time the relevant Guidelines were promulgated, and 2) the sentencing disparities between methamphetamine and ice, just as the Supreme Court found in *Kimbrough*.

**B.     Criminal History**

Defendant concurs with the PSR's recitation of her criminal history.

The vast majority of Defendant's criminal history, though, is from traffic offenses – specifically, convictions under Virginia's now-defunct habitual offender statute. Initially codified under Va. Code Ann. § 46.1-387 (Supp. 1968), the Virginia Habitual Offender Act sought to address perceived menaces to public safety who committed multiple major traffic offenses, such as driving on a suspended license. Under the Act, one who was adjudged a habitual offender could

not apply to reinstate his/her driving privilege for at least ten years. Even then, reinstatement was discretionary upon the offender's carrying the burden of demonstrating good cause.

Though many Habitual Offender laws were repealed as of July 1, 1999, Defendant amassed a number of convictions subsequent to this date having already been declared a Habitual Offender during the viability of the Act.[5] These offenses generate the majority of her criminal history points. And while convictions pursuant to statutes that are later judicially determined to be constitutionally invalid are not counted, *See* USSG § 4A1.2, Application Note 6, this Court has the discretion to vary downward given the Virginia Legislature's repealing of the Habitual Offender Act. In other words, the repealing of the statutes under which Defendant was convicted can be considered by the Court as a basis for a downward departure, even though they were repealed for a reason other than their being unconstitutional. This is particularly so given the nature of the offenses.

Indeed, USSG § 4A1.3(b) specifically addresses the situation at bar, and states in relevant part:

> (1) STANDARD FOR DOWNWARD DEPARTURE.—If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted.

And while an over-representativeness departure is rarely warranted where the defendant's criminal history reflects recidivism as to controlled substance offenses, *United States v. Stockton*, 349 F.3d 755, 764 765 (4th Cir. 2003), *certiorari denied* 541 U.S. 953, 124 S.Ct. 1695, 158 L.Ed.2d 385 (2004); see also *United States v. Atkins,* 937 F.2d 947, 952 (4th Cir. 1991) (noting that Congress considered controlled substance recidivism to be "especially dangerous"),

---

[5] The remaining portions of the Act were repealed effective July 1, 2021. Though Defendant would have been able to cure her status as a Habitual Offender as of that date and get her driving privilege reinstated, she was already incarcerated in this matter.

Defendant's criminal history does not so reflect. Indeed, her last drug-related conviction was in 2005 for possession of controlled substances (*See* PSR at ¶ 80) and she has *never* been previously convicted of drug trafficking or anything other than a personal possession type of offense that one would expect from an addict.

Section 4A1.3(b) contemplates a situation precisely like Defendant's as a basis for a downward departure. Had she only been convicted of driving on a suspended license, a misdemeanor, as opposed to the felony offenses of driving as a habitual offender (See PSR at ¶¶ 85, 88), this would have resulted in the assessment of one criminal history point for each conviction, thereby resulting in her criminal history category being reduced to no more than a category V.

Defendant's criminal history substantially overrepresents her criminal history, as well as the likelihood of recidivism or danger to the public. The recommended sentence of 120 months would provide ample opportunity to the Defendant to complete the RDAP program, discussed *infra*. This, as well as related counseling is, perhaps, what will best prevent Defendant from recidivating by ending her history of substance abuse. She will not recidivate as a Habitual Offender as recent changes to the law allow her to immediately apply to having her driving privilege reinstated. Lastly, as the Defendant will likely tell the Court at sentencing, her checkered history on paper stands in vast contrast to the substance of her convictions and the person whom she is. On these grounds, a downward departure is appropriate.

### IV. A VARIANCE IS WARRANTED UNDER §3553(a)

A sentence of 120 months imprisonment is sufficient but not greater than necessary under application of the totality of the circumstances upon an application of §3553(a). Those factors, as deemed relevant to this case, and corresponding facts are analyzed below.

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

As noted above, Defendant's formative years were fraught with issues that unquestionably did emotional damage to her and which later impacted her decision-making and judgment. Despite her being a highly-intelligent and personable individual, the reality is that these issues, coupled with a lack of opportunity, imperiled her chances of success and caused her to form unhealthy relationships. Those relationships directly embroiled her in a lifestyle of drugs and alcohol – one in which she willingly partook to numb her pain.

Her involvement in the present offense is a continuation of this cycle. Her conduct is undoubtedly serious, but like her criminal history, does not involve violence and is demonstrative of an addict who engages in relatively small-scale transactions to feed her habit without making any profit.

At the time of her offense, Defendant resided with her husband, Eric Toxey, with whom she moved to Arizona. By all accounts, and from undersigned counsel's personal dealings with him, Mr. Toxey is a decent and hard-working man who drives a tow truck, hauling disabled tractor trailers. He is regularly drug tested by his employer for drug use and maintains a sober and productive lifestyle. Of course, Mr. Toxey is both sad and dismayed by the present offense and the term of imprisonment that Defendant will face, but knowing her for the true person that she is, he is committed to standing by her side both during her incarceration and after her release from custody. His letter is attached hereto as Exhibit 1.

Defendant's relationships with her children are now all but non-existent, thereby making her relationship with her husband integral to her stability and success in the future. Her son and co-defendant, Tory Drain, was a precipitating factor in Defendant's involvement in the present offense. It is expected that the Court will order that she not have contact with him while on

7

supervised release. While this reality is understandably uncomfortable to Defendant, she is accepting of it as she knows that her sobriety and law-abiding future are dependent on her severing all ties with her son.

Defendant is now of an age at which her impending sentence will represent her last chance to not make the same poor decisions that placed her in her current predicament. When she is released from custody, she will be in her 50's and will have to start her life over (almost) from scratch. She knows full well that her commission of *any* crimes in the future will, effectively, result in a life sentence. What she also knows is that if she can get the help and treatment that she needs while she is incarcerated, the highly-intelligent and personable individual that she is can make good decisions and succeed.

> (2) the need for the sentence imposed—
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and

The Defendant's criminal history is non-violent in nature. While there is no question that the distribution of narcotics, in general, has a tremendous downstream effect that has no geographical boundaries, there is no suggestion that the Defendant's conduct has or will pose a direct or imminent threat to public safety or welfare. Indeed, there is nothing in the criminal history that indicates that she has directly harmed another person.

> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

Defendant has a long-standing substance abuse history that most probably stems from untreated psychological issues. The recommended sentence would provide her with an

opportunity to address her substance abuse issues as well as the psychological challenges she has faced from a young age, beginning with the unceremonious departure of her mother, and continuing through her being repeatedly victimized by domestic violence.

Additionally, although to a lesser degree, Defendant's medical conditions, as are more fully outline in (paragraphs) of the PSR, could be treated at an FMC, if needed.

(3) the kinds of sentences available;

A sentence of 120 months comports with the mandatory statutory minimum sentence that is required for this offense.

\* \* \*

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

A sentence of 120 months is in line with other defendants who have engaged in similar conduct both in this District and around the United States. This is particularly true as the Defendant's criminal history does not contain any drug trafficking or violent offenses. As of the filing of the instant Memorandum, codefendants Kristin Foster was sentenced to 120 months (ECF No. 142), and Shelby Proctor was sentenced to 53 months (ECF No. 143)[6].

Additionally, it is noteworthy that the government sought to test the purity of the methamphetamine mailed by Defendant in this case prior to indictment. In many districts, the government will not seek to have methamphetamine tested to establish its purity unless a Defendant affirmatively seeks to go to trial. Indeed, on March 31, 2022, defense counsel is scheduled to appear in the Eastern District of Michigan for a sentencing in which the defendant

---

[6] Given the mandatory minimum sentences that all defendants faced in this case, the defense is mindful of circumstances that likely caused this Court to sentence Ms. Foster in the manner in which it did.

pled guilty to the charge of possession with intent to distribute approximately 10 pounds of methamphetamine. In that case, the government made no effort to test the drug's purity given defendant's willingness to plead to an information.

Sentencing Defendant in this case based upon the government's selectively testing the methamphetamine in order to enhance the possible punishment, also creates a disparity in sentencing for the identical offense, albeit in different districts around the United States. In order to remedy the disparity, Defendant re-urges and incorporates her arguments under Section III(A), *supra*, and asks this Court to sentence her to a term of 120 months imprisonment.

(7)  the need to provide restitution to any victims of the offense.

Not applicable to this case.

## V.  DISCRETIONARY RECOMMENDATIONS

### A.  Location Of Imprisonment

Defendant asks this Court to recommend that she be housed at SCP Phoenix. Such a designation would place her close to family and would allow her to have frequent and meaningful contact with her husband.

### B.  RDAP

Defendant asks this Court to recommend that she be placed in the BOP's RDAP program to address her long-standing history of substance abuse. On information and belief, SCP Phoenix is one of the facilities that offers the RDAP program. To the extent that it does not, or if the BOP deems SCP Phoenix to be an inappropriate facility at which to house Defendant, she respectfully requests that the Court recommend FCI Dublin (California) as an alternate designation. Such recommendations would be in the best interests of both the Defendant and the community at large.

C. **Resolution of Outstanding Warrants**

As noted in ¶¶ 85 and 88 of the PSR, Defendant has outstanding warrants in the Circuit Court for Virginia Beach. She respectfully urges this Court to direct the United States Marshal's Service to transport her to that jurisdiction for the purposes of resolving said warrants. If the warrants are not resolved, Defendant will not be eligible for any early release credits while serving her sentence in the BOP. This may well also preclude her from participating in the RDAP program – something that is vital to her success in the future.

/s/
Brian N. Casey
Virginia State Bar No. 26710
Attorney for Jessica Bronson
CLARKE DOLPH HULL & BRUNICK PLC
5712 Cleveland St., Ste 130
Virginia Beach, Virginia 23462
(757) 446-0464
(757) 466-8242 (fax)
bcasey@clarkedolph.com

Jason D. Lamm (admitted pro hac vice)
Arizona State Bar No. 018454
Attorney for Jessica Bronson
LAW OFFICE OF JASON LAMM
2501 N. Seventh Street
Phoenix, Arizona 85006
(602) 222-9237
(602) 222-2299 (fax)
jlamm@cyberlawaz.com

CERTIFICATE OF SERVICE

       I hereby certify that on the 16th day of March, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

/s/
Brian N. Casey
Virginia State Bar No. 26710
Attorney for Jessica Bronson
CLARKE DOLPH HULL & BRUNICK PLC
5712 Cleveland St., Ste 130
Virginia Beach, Virginia 23462
(757) 446-0464
(757) 466-8242 (fax)
bcasey@clarkedolph.com